# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

MARIA S. GAZCO-HERNANDEZ, et al.,
Plaintiff,
v.
PETER NEFFENGER, ADMINISTRATOR FOR
THE TRANSPORTATION SECURITY
ADMINISTRATION, et al.
Defendants.

CASE NO. 15-2267 (GAG)

## OPINION AND ORDER

Plaintiff María Gazco-Hernandez sued Defendants Peter Neffenger, Secretary of the Department of Homeland Security, and others for discrimination based on age, religion, and sex, as well as hostile work environment due to sexual harassment, and retaliation. (Docket No. 3). She also asserts supplemental state law claims under Article 1802 of the Puerto Rico Civil Code. Id. Defendants moved for summary judgment. (Docket No. 65). For the reasons discussed below, Defendants' motion for summary judgment is **GRANTED in part and DENIED in part**. Gazco's ADEA and Title VII discrimination claims, as well as supplemental claims under Article 1802, are dismissed with prejudice. Her Title VII hostile work environment and Title VII/ADEA retaliation claims may proceed.

**I.    Local Rule 56**

Before considering the merits of Defendants' motion for summary judgment, the Court must address Gazco's non-compliance with Local Rule 56. At the summary judgment stage, parties must follow the district court's anti-ferret rule, Local Rule 56. Puerto Rico Am. Ins. Co. v. Rivera-Vazquez, 603 F.3d 125, 130 (1st Cir. 2010) (summary judgment standard "operates in conjunction with a district court's local anti-ferret rule"). Section (c) instructs that "[a] party opposing a motion

for summary judgment shall submit with its opposition a separate, short, and concise statement of material facts." L. Cv. R. 56(c). This opposing statement "shall admit, deny or qualify the facts supporting the motion for summary judgment *by reference to each numbered paragraph of the moving party's statement of material facts*." Id. (emphasis added). Per section (e), facts "shall be deemed admitted unless properly controverted." Id. (e). Since the rule purports to prevent the Court from "rummaging through a plethoric record," the First Circuit has "held with a regularity bordering on the monotonous that parties ignore the strictures of an 'anti-ferret' rule at their peril." Puerto Rico Am. Ins. Co., 603 F.3d at 131.

      Gazco's opposition is a textbook case of Local Rule 56 noncompliance. Defendants' submission contains ninety-eight facts; Gazco's opposition does not admit, deny, or qualify any, much less "by reference to each numbered paragraph." L. Cv. R. 56(c); see Puerto Rico Am. Ins. Co., 603 F.3d at 132 ("The appellants' SUF did not address, paragraph by paragraph or statement by statement, the insurers' SUF."). Instead, Gazco provides a list of seven undisputed facts and twenty-five disputed facts. (Docket No. 74). This does not comply with Local Rule 56(c). See Puerto Rico Am. Ins. Co., 603 F.3d at 132 ("Although the SUF contains eighty-eight numbered paragraphs of facts, the opposition nowhere matches up with, or even references, these numbered paragraphs. Rather, it comprises twenty-five numbered paragraphs . . . ."). And given that the parties have submitted ninety-one exhibits, Local Rule 56 compliance is even more important than usual to facilitate the Court's administration of justice. The Rule intends to protect the Court from having to ferret through exhibits to determine if a genuine issue of material fact exists. Hence, considering Gazco's noncompliance and the importance of Local Rule 56 in the context of ninety-one exhibits, the Court will disregard Gazco's opposing statement of facts. Defendants' submission shall be deemed admitted as uncontroverted to the extent it complies with Local Rule 56.

## II. Relevant Factual and Procedural Background

María Gazco is a female, Seventh Day Adventist, over forty years of age, who began working for the Transportation Security Administration (TSA) as a Transportation Security Officer in 2002. (Docket No. 65 ¶¶ 1, 6). As of filing this case, she worked as a Master Behavior Detection Officer at the F-Band level (BDO). Id. ¶ 3. Because of her religion, she took Saturdays as a "Regular Day Off," and the TSA has always granted her requests to do so. Id. ¶ 7. Throughout her employment, the TSA had non-discrimination and anti-harassment policies that Gazco was familiar with. Id. ¶¶ 4-5.

### Job Promotion Interviews

The TSA's administration guide defines the policies and procedures for interviewing and selecting BDOs. Id. ¶ 9. According to the guide, candidates are interviewed by a panel of two or three trained interviewers. Id. ¶ 10. The process consists of standard question and scoring procedures, in which candidates are asked identical questions and rated on a five point scale by each interviewer. Id. The interviewers then discuss their ratings among themselves to agree on an overall rating for each competency. Id. ¶ 11. Candidates who score three points or more in each competency "pass" the interview. Id. ¶ 12. Per the guide, those who pass make it to a BDO Selection Referral List, and a selecting official then chooses from any of the candidates in that list. Id. ¶ 14.

In 2008, a G-Band BDO position, a promotion from Gazco's F-Band BDO position, became available. Id. ¶ 15. Gazco, however, skipped the opportunity to interview. Id. ¶ 16. She was not selected, and did not file an Equal Employment Opportunity (EEO) discrimination charge for her non-selection. Id. ¶ 17.

In 2010, another G-Band BDO position became available. Id. ¶ 18. Gazco interviewed before a three-member panel, scored two points in the "Problem Solving Competency" and thus

did not make the Selection Referral List. Id. ¶¶ 20-22. Overall, she scored fourteen points, and the prevailing candidate scored twenty-three. Id. ¶ 21, 23. The Selecting Officer decided based on interview notes and scoring sheets that did not indicate the candidates' name, sex, religion, age, or EEO activity. Id. ¶ 29. Gazco did not file a discrimination charge with the EEO as a result of her non-selection. Id. ¶ 31.

Another G-Band vacancy emerged in or around November 2011, and Gazco interviewed for it on January 9, 2012. (Docket No. 65 ¶¶ 32-33). This time she scored twenty-one points, but the prevailing candidate scored twenty-six. Id. ¶¶ 34-35. In fact, two candidates tied with twenty-six points, and the Selecting Officer broke the tie by considering both candidates' Performance Accountability and Standards System (PASS) Score. Id. ¶ 36. Like prior interviews, the panel asked identical questions, tallied scores and reached a consensus for each candidate, did not require Wednesdays and Thursdays off, and did not factor religion, age, or EEO activity. Id. ¶¶ 37-38. Moreover, Gazco does not claim that she was more qualified than the prevailing candidate. Id. ¶ 39.

Gazco applied for another G-Band BDO vacancy in January 2014. Id. ¶ 46. After undergoing the same interview process as before, the TSA filled the first three vacancies with candidates who scored thirty-eight, thirty-seven, and thirty-seven points each. Id. ¶¶ 47-50. Gazco scored thirty-six points, and tied with three other candidates. Id. ¶ 51. To break the tie, the Selecting Officer considered the candidates' 2013 performance evaluation scores. Id. Gazco finished second. Id. On February 14, 2014, she was notified of her rejection. Id. ¶ 52. As to one of the prevailing candidates, Gazco alludes to her personal views of her conduct in 2011 as proof that she was not qualified. Id. ¶ 53.

Finally, in June 2014, Gazco was appointed to a G-Band BDO vacancy while a co-worker took military leave. Id. ¶ 54. She was paid at the G-Band BDO rate and her accommodation to observe the Sabbath was honored. Id.

Alleged Religious Discrimination

On or around July 30, 2011, someone traced crosses with liquid on the walls, cubicles, and desks of the BDO office. (Docket No. 65 ¶ 55). Gazco admitted that the incident affected everyone in the office because all of the eight cubicles, which were shared by twenty-seven employees, were marked by crosses. Id. ¶¶ 57, 59. After an investigation, two employees admitted that they conducted a private prayer ceremony in the BDO office, which consisted of reading scripture, praying, and anointing the walls with holy water. Id. ¶ 61. One of them explained that there was no premeditation or hidden purpose behind their religious practice. Id. In response, one of the employees received a Letter of Counseling explaining that the religious act had unintended consequences and that other employees found it disrespectful and offensive. Id. ¶ 62. After this incident, no other incident of this sort has happened again. Id. ¶ 63.

Alleged Sexual Harassment

On July 27, 2011, Gazco met with other employees and officers to discuss concerns about BDO Edward Delgado's violation of standard operating procedures. Id. ¶ 64. As Gazco specified Delgado's faults, Delgado became upset and launched his own accusations against her. Id. ¶ 65. Gazco responded by alleging that he had been sexually harassing her for the past two years, until she urged him stop on March 10, 2011. Id. ¶ 65-66.

On August 1, 2011, Gazco met with two superiors and reported the alleged instances of sexual harassment. Id. ¶ 67. The TSA issued a management directive and appointed an officer to conduct an internal administrative inquiry regarding Gazco's charges. Id. ¶ 69. In September, TSA launched another investigation into the July 27 meeting. Id. ¶ 70. After interviewing and obtaining

**Civil No. 15-2267 (GAG)**

written statements from the alleged harasser, Gazco, and several witnesses, both investigators rendered written reports concluding that Gazco's claims were unsubstantiated. Id. ¶¶ 71-72. None of the interviewed co-workers recalled witnessing any sexual impropriety between Delgado and Gazco. Id. ¶ 72.

On November, 4, 2011, a TSA officer informed Gazco that the investigation yielded no evidence supporting her allegations. (Docket No. 65 ¶ 73). Nevertheless, he informed Gazco that he had ordered to keep Gazco and Delgado in separate teams to avoid potential discomfort. Id. ¶ 73. An Interoffice Memorandum addressed to Gazco repeated the promise, and told Gazco that she should inform her supervisor if she was ever appointed to work with Delgado. Id. Since then up to Gazco's deposition in March 12, 2013, Gazco was never placed on the same team as Delgado. Id. ¶ 75.

According to Gazco, Delgado stopped making sexual remarks to her in March 2011, when she asked him to stop. Id. ¶ 76. She has also admitted that he never touched her. Id. However, after stopping the alleged harassment in March, he continued to give her "dirty looks" and "smiles," which she characterized as "sinister lusty." Id. ¶ 77. Moreover, she claims that he sat under the time clock between September 2012 and January 2014, which forced her to see him when she clocked in and out. Id. ¶ 79. According to Gazco's deposition, Delgado would sit under the punch clock with his legs wide open, causing some people to laugh. (Docket No. 65-2 at 22). He did so "primarily" when it was Gazco's turn to punch. Id. Everyone who clocked in and out, not just Gazco, saw him. Id.

TSA Admonishments

In November 2011, a TSA superior appointed another official to investigate possible TSA violations by Gazco. Id. ¶ 81. After a fact-finding inquiry involving interviews of multiple co-workers, Gazco received a Letter of Reprimand for failing to exercise courtesy and tact with fellow

co-workers and inappropriate conduct that violated TSA policies and regulations. (Docket No. 65 ¶¶ 82-83). The letter was hand-delivered on December 14, 2011. Id. ¶ 83.

Pursuant to an order by TSA management, who was concerned about her capabilities and behavior, Gazco underwent a mental evaluation for a fitness for duty report in February 2012. (Docket No. 65 ¶ 84). The report found her medically unfit for the BDO position and informed her that she would not be allowed to report to work. Id. ¶ 85. On April 27, 2012, she was terminated from her employment. Id. ¶ 86. A month later she appealed the TSA's decision and was reinstated with full back pay on June 25, 2012. Id. ¶ 87. The Office for Professional Responsibility's Appellate Board noted that that management's decision to remove Gazco was based on reliance in the finding that she suffered from a mental health condition that rendered her disqualified. Id. ¶ 88.

### Contact with the Civil Rights and Liberties Office

Gazco contacted the Civil Rights and Liberties Office (CRL) on November 8, 2011, four days after learning the results of the sexual harassment investigation. Id. ¶ 89. During the EEO counseling process, she alleged discrimination based on sexual harassment, continuing hostile work environment, denial of promotions, and the letter of reprimand. Id. Subsequently, she filed her formal complaint of discrimination alleging harassment and discrimination based on sex, age, religion, and retaliation on March 5, 2012. Id. ¶ 91. More than a year later, on May 10, 2013, the Administrative Judge dismissed the EEO complaint and remanded the matter to the TSA's CRL for a final administrative decision. Id. ¶ 93. The CRL dismissed her claim; Gazco appealed, and on June 17, 2015, the CRL's decision was affirmed. Id. ¶ 95.

Gazco contacted the EEO again on February 18, 2014, after being rejected for the BDO position four days earlier. Id. ¶ 96. She filed another formal EEO complaint on June 3, 2014, restating the same claims as her prior complaint. The repetitive claims were dismissed, but the

EEO decided to investigate the allegation that she was denied the opportunity to compete for a G-Band position on January 23, 2014. It also decided to investigate her reassignment to an administrative office after requesting that she perform a Fitness for Duty Evaluation. Id. ¶ 97. The complaint was referred to the CRL for a final administrative decision, and on July 5, 2014, the claims were dismissed because she failed to prove the decisions were triggered by discriminatory animus. Id. ¶ 98.

Gazco sued Defendants on September 14, 2015, alleging hostile work environment, discrimination based on gender, religion, and age, retaliation, and supplemental state law claims. (Docket No. 1).

### III. Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); see FED. R. CIV. P. 56(a). "An issue is genuine if 'it may reasonably be resolved in favor of either party' at trial, . . . and material if it 'possess[es] the capacity to sway the outcome of the litigation under the applicable law.'" Iverson v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006) (alteration in original) (internal citations omitted).

The moving party bears the initial burden of demonstrating the lack of evidence to support the non-moving party's case. Celotex, 477 U.S. at 325. "The burden then shifts to the nonmovant to establish the existence of at least one fact issue which is both genuine and material." Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994). The nonmovant may establish a fact is genuinely in dispute by citing particular evidence in the record or showing that either the materials cited by the movant "do not establish the absence or presence of a genuine dispute, or

that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(B). If the Court finds that a genuine issue of material fact remains, the resolution of which could affect the outcome of the case, then the Court must deny summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

When considering a motion for summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party and give that party the benefit of any and all reasonable inferences. Id. at 255. Moreover, at the summary judgment stage, the Court does not make credibility determinations or weigh the evidence. Id. Summary judgment may be appropriate, however, if the nonmoving party's case rests merely upon "conclusory allegations, improbable inferences, and unsupported speculation." Forestier Fradera v. Municipality of Mayaguez, 440 F.3d 17, 21 (1st Cir. 2006) (quoting Benoit v. Tech. Mfg. Corp., 331 F.3d 166, 173 (1st Cir. 2003)).

**IV. Discussion**

A. Title VII Gender and Religion Discrimination and ADEA Age Discrimination

Gazco alleges that she suffered discrimination based on gender, religion, and age when she was rejected for the G-Band vacancies in 2008, 2010, 2012, and 2014. The Court holds that the claims for 2008 and 2010 are time-barred and that Gazco cannot prove that TSA's legitimate reasons for refusing to promote her were pretext for discrimination.

*1. Time-barred Claims*

Before assessing Gazco's claims on the merits, the Court must dispose of those claims that are time-barred. Title VII requires a plaintiff who works for a federal agency to contact an EEO counselor within forty-five days of the alleged discriminatory act. 29 C.F.R. § 1614.105. "It is settled that a federal court will not entertain employment discrimination claims brought under Title VII unless administrative remedies have first been exhausted." Rodriguez v. United States, 852 F.3d 67, 78 (1st Cir. 2017). "This exhaustion requirement is no small matter; it 'is a condition to

the waiver of sovereign immunity' and thus 'must be strictly construed.'" Id. (citing Vazquez–Rivera v. Figueroa, 759 F.3d 44, 47-48 (1st Cir. 2014)). Similarly, under the ADEA the plaintiff is required to notify the EEO Commission about an alleged unlawful practice within 180 days of its occurrence. 29 U.S.C.A. § 633a.

The Court agrees with Defendants that Gazco's claims stemming from (1) her rejection for the G-Band BDO positions in 2008 and 2010 and (2) religious vandalism on July 30, 2011 are time-barred. Gazco first contacted the EEO counselor on November 8, 2011. (Docket No. 65 ¶ 89). Since she failed to contact an EEO counselor within 45 and 110 days after the rejection and vandalism incidents, her claims under Title VII and ADEA for these events are time-barred.

### 2. *Burden-Shifting Framework*

Title VII prohibits gender and religion-based discrimination; the ADEA applies to age-based discrimination. While Title VII requires proof that gender or religion were a motivating factor for the adverse employment action, the ADEA requires proof that age was the but-for cause. See Gross v. FBL Financial Services, Inc., 557 U.S. 167, 177 (2009). Nevertheless, "[t]he basic substantive provisions of the [ADEA] are identical to Title VII, with the substitution of the word 'age' as the prohibited basis for discrimination in place of 'race, color, religion, sex, or national origin.'" ROTHSTEIN, ET AL., 1 EMPLOYMENT LAW § 2:38 (5th ed.). Not coincidentally, both are decided through the McDonnell Douglas burden-shifting framework. Since the but-for/motivating factor causation difference between Title VII and ADEA does not alter the final result in this case, and the non-time-barred claims arise from the same facts, the Court will address the ADEA/Title VII claims concurrently.

As to the alleged religious, gender, and age-based discrimination in the 2012 and 2014 job interviews, Gazco must satisfy the McDonnell Douglas burden-shifting framework. See, e.g., Acevedo-Parrilla v. Novartis Ex-Lax, Inc., 696 F.3d 128, 138 (1st Cir. 2012) (citing McDonnell

**Civil No. 15-2267 (GAG)**

Douglas Corp. v. Green, 411 U.S. 792 (1973)). First she must establish a prima facie case, and if she does, the burden shifts to the employer to "produce a legitimate, non-discriminatory reason for the termination." Id. (citing Cameron v. Idearc Media Corp., 685 F.3d 44, 48 (1st Cir. 2012)). If the employer meets its burden, "the ball returns to the plaintiff's court, in which she must prove by a preponderance of the evidence that defendant's alleged nondiscriminatory reason was in fact a pretext for discrimination." Goncalves v. Plymouth County Sheriff's Dep't, 659 F.3d 101, 105 (1st Cir. 2011). At the final stage, the only difference between the ADEA and Title VII concerns causation: ADEA requires "but-for" causation and Title VII requires proof that sex or religion were a motivating factor.

For diligence, the Court may assume *arguendo* that a plaintiff has satisfied the prima facie case and proceed to the questions of legitimate business reasons and pretext. See Mesnick v. General Elec. Co., 950 F.2d 816, 828 (1st Cir. 1991) ("If we assume, *arguendo,* that the plaintiff established a prima facie case . . . the case boils down to what we have termed the ultimate question: did [plaintiff] present sufficient evidence that [defendant's] stated reason was a pretext for retaliation?").

Defendants articulated legitimate business reasons for not promoting Gazco. The TSA had a neutral, points-based system for interviews and promotions. In 2012, the panel awarded Gazco twenty-one points, which was lower than the prevailing person's twenty-six. (Docket No. 65 ¶¶ 34-35). And in 2014, Gazco tied with three other candidates. To break the tie, the Selecting Officer chose the candidate with the highest performance evaluation score in 2013, which was not Gazco. Id. ¶ 51. The information available to the selecting official did not indicate the candidates' name, sex, religion, age, or EEO activity. Id. ¶ 29. Moreover, at least during the 2012 interview process, the panel asked identical questions, and a Wednesday-Thursday regular day off was not a part of the job description. Id. ¶¶ 37-38.

**Civil No. 15-2267 (GAG)**

Shifting the burden back to Gazco to show that these legitimate business reasons were in fact pretext for discrimination, the Court finds that Gazco has not proffered evidence that would create a genuine issue of material fact. Instead, Gazco has only alluded to her personal views of one of the 2014 prevailing candidates' conduct in 2011 as proof that she was not qualified. Id. ¶ 53. But this does not prove that age was the but-for cause, or that gender or religion were motivating factors in the TSA's decision not to promote Gazco. Moreover, Gazco was eventually appointed to a G-Band BDO vacancy while a co-worker took military leave. Id. ¶ 54. She was paid at the G-Band BDO rate and her accommodation to observe the Sabbath was honored. Id. The fact that TSA filled a vacancy with the first runner-up in the prior interview process suggests the exact opposite "of weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions *in the employer's proffered legitimate reasons*.'" Carreras v. Sajo, Garcia & Partners, 596 F.3d 25, 37 (1st Cir. 2010) (emphasis in original) (citing Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 56 (1st Cir. 2000)). The absence of any facts indicating potential inconsistencies and contradictions does not allow an inference "that the employer did not act for the asserted non-discriminatory reasons." Id. Therefore, Defendants' motion for summary judgment on the counts of discrimination based on age, religion and gender is **GRANTED**.

B. Title VII: Hostile Work Environment

Defendants argue that the hostile work environment claims are time-barred. In the alternative, Defendants contend that Gazco cannot prove that she was subjected to unwelcome sexual harassment or that the alleged harassment was based upon sex. Defendants also argue that the alleged harassment was not severe nor pervasive, and, even if so, there is no basis of employer liability. The Court disagrees.

*1. Time-barred Claims*

A genuine issue of material fact exists as to whether Gazco's hostile work environment claim is time-barred given the continuing violation doctrine. As discussed earlier, Title VII requires a plaintiff who works for a federal agency to contact an EEO counselor within forty-five days of the alleged discriminatory act. 29 C.F.R. § 1614.105. The continuing violation doctrine allows a plaintiff to recover for "discriminatory acts that otherwise would be time-barred so long as a related act fell within the limitations period." Tobin v. Liberty Mut. Ins. Co., 553 F.3d 121, 130 (1st Cir. 2009). The doctrine "allow[s] suit to be delayed until a series of wrongful acts blossoms into an injury on which suit can be brought." Ayala v. Shinseki, 780 F.3d 52, 57 (1st Cir. 2015) (quoting Morales-Tañón v. P.R. Elec. Power Auth., 524 F.3d 15, 19 (1st Cir. 2008)).

In March 2011, Gazco told Delgado to stop harassing her. In July, she complained, and in November, she filed a formal complaint. Indeed, more than 45 days elapsed between March, when Delgado stopped making sexual remarks at Gazco, and July, when she complained. But according to Gazco, throughout this time, Delgado continued staring at Gazco in a "sinister lusty manner," and later, sat under the time clock where she punched and spread his legs when she approached. A jury might find that these acts were related to the alleged harassment that Gazco asked Delgado to stop in March. Since these acts fall within the limitations period, she could recover for the preceding acts as well. Thus, a genuine issue of material fact exists as to whether Gazco's hostile work environment claims predating March, 2011, are time-barred.

*2. Burden Shifting Framework*

To state a prima facie case of hostile work environment under Title VII, a plaintiff must show:

> (1) that she (or he) is a member of a protected class; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based upon sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment; (5) that sexually

**Civil No. 15-2267 (GAG)**

> objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established.

Forrest v. Brinker Int'l Payroll Co., LP, 511 F.3d 225, 228 (1st Cir. 2007) (quoting Crowley v. L.L. Bean, Inc., 303 F.3d 387, 395 (1st Cir. 2002)).

*i.  Second and Third Prongs: Unwelcome Harassment Based on Sex*

Even assuming the harassment predating March is time-barred, a genuine issue exists as to whether Gazco was subject to sexual harassment through the non-time-barred acts consisting of staring and leg-spreading. Gazco has testified that she was subject to unwelcome harassment in the form of staring and leg-spreading, and that creates an issue of fact for the jury to decide. Second, "[f]or harassment to be based on sex it need not be an act motivated by sexual desire but rather the harassment must be gender specific." Gerald v. Univ. of Puerto Rico, 707 F.3d 7, 17 (1st Cir. 2013). The fact that Gazco spread his legs "primarily" when it was Gazco's turn to punch the time clock allows an inference that the alleged harassment was based on sex.

*ii.  Fourth Prong: Severe and Pervasive*

Defendants also contend that the alleged harassment was not severe nor pervasive. To assess if conduct satisfies the "severe and pervasive standard," the First Circuit considers "the severity of the conduct, its frequency, whether it is physically threatening or not, and whether it interfered with the victim's work performance.'" Ponte v. Steelcase Inc., 741 F.3d 310, 320 (1st Cir. 2014) (citing Gerald, 707 F.3d at 18). This severity "should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998) (quoting Harris, 510 U.S. at 23)

Viewed in isolation, the staring and leg-spreading might not rise to the level of severe and pervasive conduct, especially when considering First Circuit precedent. See, e.g., Ponte, 741 F.3d at 320 (resting hands on a subordinate's shoulders not severe and pervasive); Morgan v. Mass.

Gen. Hosp., 901 F.2d 186, 192-93 (1st Cir. 1990) (physical contact from behind, looking at plaintiff's genitals, and unwanted touching not severe and pervasive). However, the First Circuit has warned against drawing analogies between cases to determine what conduct crosses the line and what conduct does not. Billings v. Town of Grafton, 515 F.3d 39, 49 (1st Cir. 2008) ("The highly fact-specific nature of a hostile environment claim tends to make it difficult to draw meaningful contrasts between one case and another for purposes of distinguishing between sufficiently and insufficiently abusive behavior."). This does not mean that district courts cannot draw these contrasts, but that they should be careful when doing so and not allow precedent to override the totality of the circumstances.

Considering the totality of the circumstances, a juror could interpret the staring and leg-spreading as severe and pervasive conduct. These acts occurred after Gazco asked Delgado to stop making sexual remarks. They continued after the TSA investigated the alleged sexual harassment and after Delgado was separated from Gazco, who believes that the investigators protected Delgado "because he is one of the boys." (Docket No. 65-1 at 48). A juror could infer from these facts that Gazco suffered from an abusive work environment—one where sexual harassment went unpunished and her alleged harasser felt he could misbehave with impunity at her expense.

*3. Sixth Prong: Employer Liability*

When a plaintiff accuses a non-supervisory co-worker of sexual harassment, "the employer is liable only if the plaintiff can demonstrate that the employer was negligent." Reed v. MBNA Mktg. Sys., Inc., 333 F.3d 27, 32 (1st Cir. 2003). To prove negligence, a plaintiff must prove that her employer "knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate action." Id. (citing Crowley, 303 F.3d at 401). "Determining what constitutes a 'prompt and appropriate' employer response to allegations of sexual harassment often requires the sort of case-specific, fact-intensive analysis best left to a jury." Forrest, 511 F.3d

at 232.

Gazco barely survives summary judgment on this matter. She has offered no proof that the TSA knew or should have known of Delgado's alleged harassment before she reported it in July 2011. Moreover, the Court finds that no reasonable juror could conclude that the TSA did not take prompt and appropriate action upon learning of the alleged harassment in July 2011. Upon learning of her charge, TSA launched two investigations. (Docket No. 65 ¶¶ 69-70). Two officers interviewed Gazco, Delgado, and potential witnesses. Id. ¶¶ 71-72. Despite finding that no harassment took place, the TSA ensured that Gazco and Delgado would not work together and asked Gazco to inform them if they did. Id. ¶ 73. For the relevant period, Gazco and Delgado did not work together. Id. ¶ 75. As to the continuing looks, Gazco admits that she did not complain about Delgado's behavior, and she offers no evidence as to whether the TSA knew or should have known of said behavior. Id. ¶ 77. Thus far, it would appear that the TSA is entitled to summary judgment on this matter. See, e.g., Forrest, 511 F.3d at 232 (holding, in the context of ex-lovers, that response was prompt and appropriate when employer had policy prohibiting sexual harassment, trained its managers to take disciplinary action against offenders, and took remedial action against alleged harasser three times, ultimately firing him).

But the Court must deny summary judgment based on Delgado's behavior at the time clock. Delgado would sit under the punch clock with his legs wide open, causing some people to laugh. (Docket No. 65-2 at 22). He did so "primarily" when it was Gazco's turn to punch in and out. Id. The fact that this happened in a public area before other employees creates an issue of material fact as to whether the TSA knew or should have known that this potentially harassing behavior was happening. The fact that it happened more than once, per Gazco's testimony, allows an inference that the TSA failed to take prompt and appropriate action to remedy the alleged

**Civil No. 15-2267 (GAG)**

harassment. Therefore, summary judgment on Gazco's hostile work environment Title VII claim is **DENIED**.

C. Retaliation

In Title VII and ADEA retaliation cases, the Court applies the three-step burden shifting framework articulated in McDonnell Douglas Corp. v. Green. First, a plaintiff must prove a prima facie case of retaliation "by showing that (1) she engaged in protected conduct, (2) she was subject to an adverse employment action, and (3) a causal connection existed between the first and second elements." Colon v. Tracey, 717 F.3d 43, 49 (1st Cir. 2013). Very close temporal proximity between protected conduct and adverse action can establish a causal connection. Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273-74 (2001). Unlike discrimination cases, both Title VII and ADEA retaliation claims require but-for causation. Univ. of Texas Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2528 (2013).

Here, Gazco satisfies the three elements of a prima facie case. She engaged in protected conduct when she contacted the CRL on November 8, 2011, filed an EEO complaint on March 5, 2012, and filed a second EEO complaint on June 3, 2014. She was subject to an adverse employment action when she received a Letter of Reprimand on December 14, 2011, a notice of proposed removal on March 19, 2012, and when she was not selected for the BDO vacancies in January 2012 and January 2014. As to the third factor, Gazco can establish causation through temporal proximity. There was only one month between her contact with the CRL and her Letter of Reprimand in 2011. Likewise, only two weeks elapsed between her formal EEO complaint and her notice of proposed removal in March, 2012. As to the first BDO vacancy, only two months passed between the CRL contact in 2011 and her rejection in 2012. See Mariani-Colon v. Dep't of Homeland Security, 511 F.3d 216, 224 (2007) (two months was "sufficient to meet the relatively light burden of establishing a prima facie case of retaliation"). As to the second BDO vacancy,

17

**Civil No. 15-2267 (GAG)**

Gazco fails to satisfy the prima facie test because she has not proven a causal connection between protected activity and protected conduct. But because she has met her burden of proof for at least three adverse acts, the Court must proceed to the second and third part of the McDonnell Douglas test.

If a plaintiff successfully establishes the three elements, the burden shifts to the defendant to "articulate a legitimate, non-discriminatory reason for its challenged actions." Colon, 717 F.3d at 49 (citing Provencher v. CVS Pharmacy, Div. of Melville Corp., 145 F.3d 5, 10 (1st Cir. 1998)). And if the defendant meets his or her burden, then "the ultimate burden falls on the plaintiff to show that the proffered legitimate reason is in fact a pretext and that the job action was the result of the defendant's retaliatory animus." Id. (citing Fennell v. First Step Designs, Ltd., 83 F.3d 526, 535 (1st Cir. 1996)). The plaintiff's "evidence [of pretext] must be of such a strength and quality as to permit a reasonable finding that the . . . [challenged employment action] was obviously or manifestly unsupported." Ruiz v. Posadas de San Juan Associates, 124 F.3d 243, 248 (1st Cir. 1997). "An employee can establish pretext 'by showing weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions *in the employer's proffered legitimate reasons* such that a factfinder could infer that the employer did not act for the asserted non-discriminatory reasons.'" Carreras, 596 F.3d at 37 (emphasis in original) (citing Santiago-Ramos, 217 F.3d at 56).

The TSA has provided legitimate business reasons for all of its adverse employment actions. It justified the Letter of Reprimand because it was based on a fact-finding inquiry that revealed Gazco failed to exercise tact and courtesy with co-workers. (Docket No. 65 ¶¶ 82-83). Likewise, the Notice of Proposed Removal stemmed from a mental evaluation and fitness report. Id. ¶ 85. And finally, as discussed earlier in the context of discrimination, the BDO interviews followed a procedure where the TSA promoted candidates who scored higher than Gazco.

Gazco creates an issue of fact as to pretext. On the one hand, she has offered no evidence that would prove that the legitimate business reasons for the Letter of Reprimand and BDO selection were pretextual. But on the other hand, she appealed the TSA's decision to discharge her following the mental fitness report—and won. (Docket No. 65 ¶ 87). The fact that she was reinstated after her appeal could allow a reasonable juror to infer that the reasons for the notice of removal two weeks after she filed an EEO complaint were pretext for retaliation. It is possible that but-for her complaint, she would not have been discharged. Therefore, Defendants' motion for summary judgment as to Gazco's retaliation claim is **DENIED**.

D. Supplemental Jurisdiction

Gazco asserts supplemental state law claims only under Article 1802 of the Puerto Rico Civil Code. Article 1802 is Puerto Rico's general tort statute, which provides that a person who "causes damages to another through fault or negligence" shall be liable in damages. P.R. LAWS ANN. tit. 31 § 5141. However, the United States is immune from suit unless it consents otherwise, and it "has not waived its sovereign immunity for suits under Puerto Rico's laws." Velazquez-Rivera v. Danzig, 234 F.3d 790, 795 (1st Cir. 2000). Therefore, Gazco cannot sue Defendants in their official capacity under Article 1802.

Moreover, it is well-established that a plaintiff cannot recover under Article 1802 for discrimination and retaliation causes of action. "To the extent labor legislation has created new causes of action to address previously uncovered aspects of employment relationships as in the case of *discrimination and retaliation*, it has been subjected to the same remedial exclusivity principle barring redress under general statutes such as Article 1802 of the Civil Code." Santana-Colon v. Houghton Mifflin Harcout Pub. Co., 81 F. Supp. 3d 129, 141 (D.P.R. 2014) (emphasis added). Here, three of Gazco's four causes of action under Article 1802 involve discrimination and retaliation. (Docket No. 3 at 13-14). Since labor legislation has created causes of action under

**Civil No. 15-2267 (GAG)**

federal and state law for these aspects of employment relationships, recovery under 1802 would be barred even if the United States waived its sovereign immunity.

Gazco's fourth claim under 1802 for "slander" would also fail even if it had been brought under the Federal Tort Claims Act (FTCA). (Docket No. 3 at 14). The FTCA waives sovereign immunity for many tort-based suits, but not to "[a]ny claim arising out of . . . libel [or] slander . . . ." 28 U.S.C. § 2680(h). "If a claim comes within one of the exceptions listed in section 2680(h), then the district court lacks subject-matter jurisdiction and must dismiss the claim." <u>Dynamic Image Techs., Inc. v. United States</u>, 18 F. Supp. 2d 146, 149 (D.P.R. 1998). Here, the Court would lack subject matter jurisdiction over Gazco's slander allegations because Defendants are covered by the FTCA and immune from slander suits.

Since the United States enjoys sovereign immunity, Defendants' motion for summary judgment is **GRANTED**. Gazco's supplemental claims under Article 1802 are dismissed with prejudice.

**V.     Conclusion**

For the reasons discussed above, Defendants' motion for summary judgment is **GRANTED** in part, **DENIED** in part. Gazco's ADEA and Title VII discrimination claims, as well as supplemental claims under Article 1802, are dismissed with prejudice. Her Title VII hostile work environment and Title VII/ADEA retaliation claims may proceed.

**SO ORDERED.**

In San Juan, Puerto Rico this 20th day of March, 2018.

*s/ Gustavo A. Gelpí*
GUSTAVO A. GELPI
United States District Judge